The next case today is United States v. Edilio Benjamin-Hernandez, Appeal No. 20-1236, and United States v. Yohani Balbuena-Hernandez, Appeal No. 20-1295. Attorney Rickerhoff, please introduce yourself to go on the record.  On behalf of Appellant Yohani Balbuena, this is Attorney Herman Rickerhoff. You may proceed, Counselor. Thank you, Your Honor. I'll begin, I'll go straight to the Speedy Trial Act, and I'll address the points where the government and the defense have a different position. There are three main areas that we addressed in our brief, and I'll be talking about now. Those are, first of all, the delays attributed to co-defendant motions, the superseding indictment, and the ends of justice delays ordered by the District Court. Regarding co-defendant motions, the record is littered with delays attributed to co-defendant motions or time that the court felt it needed to resolve co-defendant motions. To offer one such example, on Ducat Entry 11, the government claims a proper exclusion of 30 days from December 2, 2015, to January 1, 2016, for a motion to restrict document by co-defendant Edilio Hernandez under 3161H1. It is the defense's position that the time needed for the disposition of a co-defendant's as the government and the District Court would have it, automatically excluded. The Supreme Court has held that in the context of Speedy Trial exemptions, 3161H6 does not create an automatically excludable period of delay when there is a triggering event such as a co-defendant motion. Counsel, how does that help your case here, because isn't that a period of time that comes before the operative second superseding indictment here? It did come before the second superseding indictment, yes. And the court counted these 30 days as excludable under the Speedy Trial Act, and it shouldn't have been excluded under the Speedy Trial Act. But in light of the second superseding indictment, which necessarily means that the first two indictments were not what the defendants went to trial on, how does that help either the statutory argument or the Sixth Amendment argument here? By the time the second superseding indictment came around, the Speedy Trial Act had expired, Your Honor. So our position is that these exclusions by the district court, they should have never happened with any of the co-defendants motions, because the district court never subjected these motions to a reasonable standard. And under Supreme Court cases, including Henderson and Bloat, which we included in our brief, the district court, these were supposed to be subjected to a reasonable standard. Not only that, but in Bloat, the Supreme Court took it a step further, adding that the district court had an obligation to make a reasonableness finding. Here there's nothing on the record to support that a 30-day delay with this particular example was reasonable. Could you go back to Judge Kasper's point? As I understood it, the prior indictments were dismissed, the second superseding indictment became the operative indictment, and there was no objection to the dismissal of the prior indictments without prejudice? If that's the case, if my understanding is correct, then I think you would need to focus on some Speedy Trial Act violation that occurred after the date of the second superseding indictment. Well, the defense did raise the Speedy Trial before the first superseding indictment and before the second superseding indictment. Did you object to the dismissal of the prior indictments without prejudice? I don't think there's an objection on the record, but the defense did raise the Speedy Trial Act at several times throughout the case. You can have a violation of the Speedy Trial Act that the remedy for it is a dismissal without prejudice of the indictment. I don't think there was an objection by the defense to the dismissal without prejudice of the original indictment. Only an argument raised as to the Speedy Trial. It seems you have only two available arguments. One is, notwithstanding that the prior indictments were dismissed without prejudice, you can still press as an alternative remedy some violation of the Speedy Trial Act that occurred prior to the second superseding indictment, which I wouldn't quite understand, or alternatively that there was a Speedy Trial Act violation that infected the proceedings subsequent to the second superseding indictment. I believe, Your Honor, that in our calculus, even taking the superseding indictment as a starting point, there are more than the 70 non-excludable days to amount to a Speedy Trial Act violation. And which days would you point us to? If I may have just a second, Your Honor. Well, I would point to all the interest of justice delays ordered by the district court, which, if I believe we stated, amounted to, I don't remember if it was one year, essentially one year or two years of interest of justice delays where the district court did not follow Supreme Court precedent and just made a generic reference to ends of justice without making any specific findings for those ends of justice, interest of justice delays. We've addressed them in our brief. They are addressed chronologically and they would be the points that we address in our superseding indictment, which include, again, a number of interest of justice delays ordered by the district court without the specific findings required. Some of them that we address in our brief make generic references or just a mention in passing to discovery or the complexity of the case, which we submit is not enough, is not sufficient. We've submitted for the court's consideration, legal authorities to that effect. Were these challenges made in the district court, the failure to make interest of justice findings subsequent to the second superseding indictment? I believe they were made generically, Your Honor, not one by one as I did in the brief, but they were made generically in the motions to, motions on those PD trial and motions to dismiss filed by the defense. All right. Thank you, Mr. Rickhoff. You would mute your devices. We will hear from Ms. Tirado. Yes. Good morning, Your Honors. Again, Maria Angela Tirado-Valez on behalf of Edilio Benjamin Hernandez. We will focus our argument. We will first, we want to reserve one minute for remodel. Yes. We may. We will be focusing our argument mainly on the issue and the matter of overview testimony by Agent Garcia. The first thing that we must mention is that the government concedes that there was overview testimony, however, they state that it was not, that it was harmless. We disagree with their assessment. In this case, the testimony of Mr. Garcia, Agent Garcia, basically was the most important testimony to bring the evidence or the most impacting evidence against the defendants and particularly Edilio's case, which were 12 recordings. In Garcia, not only interprets all the recordings and gives his insight as to what he believes that the persons, the speakers are talking about, another thing is that in the recordings, in none of the recordings, the speakers identify themselves by names. Garcia basically infers that it is Edilio, one of the speakers, and he does that. We go to the case frame. In this case, the defendants were arrested October 14, 2015, and it was after their arrest that the DEA contacts the DMCD, which is the Dominican Republic National Drug to inquire about a phone that Mr. Edilio had provided them. From then on, they go backwards to search and to make a search on that phone. They determined there is a phone that was under surveillance. However, at that time, they didn't know or no one knew who Edilio was. They go back and they do a puzzle to identify who this person is. Anyways, in his testimony during the trial, Garcia not only testifies about the role of Edilio, he says that he identifies him as a drug courier in a first recording that was never introduced and the defense didn't have even the opportunity to hear or to cross-examine about because it was not provided, but it was a testimony that came in court and it was objected, and he identifies Edilio as a drug courier. Then the first recording, he says that an unidentified person wanted to hire Edilio to drive a vessel, meaning that he was going to be the captain of the vessel. That testimony of placing him as a captain is, in fact, a testimony that is a preview of Danny Montanez, which is a government witness's testimony and who later on testifies that he knew Edilio from the town, not that he has spoken with him or nothing, but that he knew who he was and also testifies that when he was making a deal with Mickey King, Batista, to give him some drugs to take on a trip, he saw Edilio hanging out near the place where the drugs were being delivered, but he didn't spoke with Edilio himself. Can we break this down? You've got a lot of pieces here. Yes. You mentioned first that the officer identified his voice. That's not overview testimony, is it, if the officer is saying he's heard the voice before and that's his voice? Well, the thing is that there is an issue with the voice here because this captain was not familiar with the voice. He just goes back to the investigation and he listens to the recordings. When he is first asked to get information or to provide information to the DEA about this number and about Edilio, he has to go back to his records. In his records, he finds a picture in which he danced. It was not even taken by him or there was no recording about it, but he danced saying, oh, this person, we are identifying him as Edilio. So then he starts looking at the phone and he finds a message in one of the phones, a message which identifies a person by the name of Edilio as receiving or giving $3,000. And it's with that message that he goes to the phone recordings and when he listens to a phone recording that seemingly speaks about $3,000, he says, well, this must be Edilio. So Edilio was unknown to the Dominican Republic authorities and to this Garcia at the time when he was asked about him from the DEA. So we understand that his identification is based on the revision of records and making up inferences of who Edilio must be according to a message. You're losing me here. I thought he listened to at least two phone conversations. Yes. And he said it's the same person, Edilio. Yes, he said. My question was simply, that's not overview testimony, is it? Listening to a hearing and listening to the telephone conversations is not overview testimony as such, Your Honor. But testifying as to interpreting what the jury should listen or should understand from those conversations, it is, Your Honor. And basically, this agent Garcia throughout his testimony, he interprets what the jury should understood from the conversations. So he is basically telling the jury what should they decide that the conversations mean are drug related. And also, Your Honor, and so this account and in other interpretations, because during all his testimony, what he does, it's not just authenticating the telephone conversations. It's interpreting what the persons are saying and what should the jury understand. That's a basic- Ms. Tirado? Yeah. Thank you. You've reserved some time. Thank you. We'll hear from Ms. Maconiatis. Ms. Tirado, if you would mute your devices at this time. Good morning again, Your Honors. May it please the court, Julia Maconiatis for the United States. Now, the district court did not abuse its discretion in denying appellant's motion to dismiss based on violation of the Speedy Trial Act and the Sixth Amendment right to speedy trial. I'd like to start off by clarifying that the motion filed with the district court had these two sources of authority, the Speedy Trial Act and the Sixth Amendment. However, down below, the appellant's Speedy Trial Act violation was limited in scope. That, therefore, limits what can be reviewed on appeal. By appellant's own motion, the only time they challenged was from November 2015 up until May 2016. They doubled down on their reply to the government's response, clarifying that the motion to dismiss under the Speedy Trial Act only challenged those portions of time. It never made any specific or general challenges of time after the second superseding indictment was rendered by the district court. Now, this court's own jurisprudence, along with a statute in Section 3162A2, states that unless you make a specific objection, a failure to move to dismiss based on certain times will preclude the waiver of that right. And this court's jurisprudence also say that. So newfound times that are being challenged under the Speedy Trial Act, therefore, come, and I quote, too little too late. So the only preserved challenge under the Speedy Trial Act was that original portion under the preceding judge from November 2015 to May 2016. However, we have a superseding indictment in July of 2016, which through this court's jurisprudence resets the Speedy Trial Clock. And at no point did the appellants ever below object to the superseding indictments or request that because of potential violations that occurred stemming from the original indictment, that there should have been a dismissal with prejudice. They did not do that below to the district court, nor have they done it on appeal. The government nonetheless included arguments in our brief that if the court were to consider that, why it should have been a dismissal without prejudice following the three factors let out in 3162A and the fourth judicial factor. And if your honors would like me to get into that, I have no problem doing so. Were they detained by either federal law enforcement or immigration authorities during this period of time? Yes, your honor. Pursuant to their arrest, they were in federal custody after their arrest in November of 2015. And that was for this crime as opposed to for immigration? Yes, your honor. It was for this crime. The immigration charges came to be in the second superseding indictment. The first indictment was just drug trafficking charges. The second indictment was drug trafficking charges that added new defendants and new charges. And in the second superseding indictment is when the immigration charges come to the first time and that's in July of 2016. You would agree this is sort of a long time to keep someone detained who hasn't been convicted of anything? Your honor, as the government did agree in the sixth amendment analysis of whether there was a violation of the speedy trial, that the length of the delay, it's a presumptive delay because it's over one year and that factor favored the appellants. However, when we look at the sixth amendment analysis, Barker v. Wingo charges the district court in balancing four different factors. And the court found that two factors, the length of the delay and their assertion of that right, while it did support defendant's argument, the focal inquiry, which is the reason assigned for the delay, along with a prejudice to the defendant, outweighed and determined that there was no constitutional sixth amendment violation to speedy trial. And when we look at the facts of this case, it's understandable, although yes, I am in agreement with your honor that 35 months is a long time to be tried. But when we look at the reason assigned, we have a complex multi-defendant drug importation case. And this court has explained that it's not error for the district court's goal to try all joint defendants together. And that's the norm in Vega Molina. And also in United States v. Casas, this court found that a 41 month delay, which is six months more in this case, was not a constitutional error because noting the prosecution of co-defendants is justified as an efficient administration of justice. And here... Haven't we also cautioned that the boundaries here are getting pressed pretty closely? Yes, your honor. And that's why we're explaining that the length of the delay, in fact, does favor the defendants. And in Casas, there was that caution. But I would say there's two main differences between this case and Casas Judge Cayeta. First, the Casas case had six months more of a delay. Like the Casas case, however, here, appellants played part of the significant delay with their own motion practice. As noticed by the district court in the opinion in order denying the motion to dismiss, there were 43 pretrial motions of these two defendants alone, 16 including pro se motions for new counsel that had four different hearings with a magistrate judge to try to get to the bottom of what the issue was. The court estimated that these motions alone contributed in 11 months of the delay. However, there's also unexpected twists that happened in this case that did not happen in Casas. Here, we have an original judge who retired. Balbuena's first attorney was ill and unavailable for months. But I would say the most neutral and biggest factor that separates this case from the Casas decision was the passage of Hurricane Maria, which was a catastrophic hurricane that sent the district court and all of Puerto Rico in a tailspin for months. From September, October, November, December, and part of January, the district court was shut down. And when it opened up in January, the first thing that happened in this case was a hearing, and both appellants were then given new counsel. And then shortly thereafter, appellants, new counsel looked in the record and filed this motion to dismiss. But that is a neutral factor. But then when we go again to the prejudice to the defendants, the district court properly found that it was limited to pretrial incarceration. And while they did experience idleness and separation, the length of the detention alone in this case is not sufficient to establish constitutional prejudice. Here, their pretrial detention will be credited to them. And in this case, again, we had a hurricane that stopped the proceedings for some time. And when you take that into consideration with a focal inquiry, where we have complex litigation and where we have appellants' incessant motion practice, this case is like Casas in the extent where it was not an abusive discretion to find there was no Sixth Amendment violation to appellants' right to speedy trial. How was this case complex? You found two guys at the scene of the boat with an unbelievable story and incriminating circumstances. And I think one of them then begs an admission. And that sounds like you could try that up pretty quickly. Well, Your Honor, within the first superseding indictment was that fact pattern. But then in the second superseding indictment, we had more of the individuals for that same fact pattern come in. And it wasn't until after the second superseding indictment that you have these individuals saying, I want my trial. Severance came later. But at that point, we had the motion practice going back and forth. And I can get to the dates, but it was in 2016 where most of the motion practice starts, the pro se motion practice starts getting in. But you even have, in May of 2016, defense attorneys requesting more time and continuing to investigate the situation once co-defendants Mickey King and once co-defendants Danny Montana are in the case. So when you look at the docket itself, the first attorneys in the beginning, even before the second superseding indictment, when the first superseding indictment came that had Mickey King and Danny Montana, you have the attorneys asking for more time. It wasn't until later in the next year that the issue of severance actually came up. In the beginning, there was just the two guys in the boat, as Your Honor said. Then there's a second time. So when we look at the case in general, you see that a lot of the delays did in fact result from either the attorneys asking for more time or pro se appellants asking for new counsel. Then at the end, you add a catastrophic hurricane and it explains as to how we got to the 35 months, but the district court was cognizant. Once the motion to dismiss was filed, even prior to ruling on the motion to dismiss, the court indeed severed the case for trial for these two defendants and did not wait for the individuals because it was concerned that years had gone by. And even though it ultimately denied the motion to dismiss, Your Honor, it had previously severed the case, I think a month and a half after the motion to dismiss was filed and almost two months before it was actually ruled upon. Now turning to the evidentiary issues filed by Mr. Benjamin, he is not entitled to a new trial based on the district court's evidentiary rulings. Starting off with the voice identification, it should be noted that there was never an objection in the district court to Mr. Garcia's ability to identify Benjamin's voice and it is for plain error only. It should also be noted that appellants did not recognize the standard and by virtue of not being able to fulfill their burden, it has been waived, but there's no plain error nonetheless. Here, the rule of evidence 901, this court has explained that it's an uncomplicated process. The rules don't erect a particularly high hurdle. Where there is sufficient showing to allow a reasonable person to believe that the evidence is what it purports to be, that's enough and then the fact finder can attribute the appropriate weight and this can be done through circumstantial or direct evidence. Now in this case, there was plenty of evidence for the police officer Garcia to be able to identify Mr. Benjamin's voice. He explained that when Benjamin was arrested and he was asked for his contact number in the Dominican Republic, he gave a number which the DEA then talked to the Dominican Republic authorities and that number had previously been subject to a judicial wiretap and I want to correct what may have been sort of a confusion. There's nothing on the record that shows what indeed happened. We know that in 2015, before this happened, they were surveilling Mr. Benjamin and at that point later there was a phone tap. We know that in 2015, Garcia in August did physical surveillance to see who was using that phone number and they have a picture of Mr. Benjamin on that day and then they subsequently tapped his phone lines. There was a text message that said, hi Jomani, I am Edilio. Now this is the equivalent of someone answering the phone and acknowledging their identity. If I were to answer the phone and say, hello this is Julia, that text message is the functional and equivalent and it is a piece of evidence that therefore Garcia had in his arsenal to say I know that this man is Benjamin. But that's not only that. We know that that phone number, which he stated was his contact number, was subject to various wires and Mr. Garcia heard those wires and he was able to identify his voice based on familiarity and this circuit has said that that's the most commonplace way to identify voices. So there was no error and there was no objection brought up and given these facts, it was not clear and obvious error that Mr. Garcia was able to identify Mr. Benjamin's voice. Now turning to the overview testimony, in this case, in his brief, Benjamin has failed to identify with did in fact result in overview testimony. However, the government, in reading the testimony, can say that there were two occasions in Mr. Garcia's testimony where he stated, and it's the same statement twice, paraphrasing it, that this organization wanted to hire Edilio to be the courier of the drugs. Now the government, in its brief, stated that this in fact can be classified as overview testimony. However, in this particular case, with the overwhelming evidence, that it was harmless. And what is that evidence, Your Honor? First, we have the way that the government brought its case was, first, there was Officer Pabon, who testified that on the early morning of the intervention, he saw a boat, a pink and blue boat, entering the river Cebuco with two individuals. And when he ran to the site, he heard the boat capsize and he saw an individual running away. On the boat, we have 333 kilograms of cocaine. He calls for help and an off-duty police officer, Pacheco, finds and intervenes with two Dominican nationals that are close to the area. With the boat are also Dominican water bottles, and they give this implausible story that they were there having, spending some time with some lady friends. When they're in custody, Edilio gives his contact phone information, which is now being subject to a wire in the Dominican Republic. The phone that he had on him that day, he gives consent to search it. And it shows that from 5 a.m. in the morning up until the time that they are arrested, there are many phone calls coming in and out from 781 numbers and also phone calls from the Dominican Republic, same numbers that had been tapped from the week before with Edilio's voice being recognized on that phone call. So we have a phone call from the night before they left on October 12th, saying that go with God. And then the next morning when they're at 33 hours later, excuse me, when they're in Puerto Rico, that same phone number is calling the phone that Edilio had on him at that time. What's more, we have Danny Montana. Danny Montana also stated that the boat did make it to Vega Baja, but however, it capsized once local authorities had spotted the boat and that the drugs were abandoned. I'm going to interrupt you there briefly to ask the court whether you need to hear more on this line of argument or have questions at this time. I do not. All right. Thank you, counsel. If you would mute your devices. Ms. Tirado, you've reserved a minute. Yes, Your Honor. What I would like to stress in the overview testimony is that we believe it's not harmless in this case because in the testimony of Garcia, by interpreting all the phone calls, he suggested to the jury what inferences they should draw from the evidence and from what was being said. Second, he does comment and testifies directly as to what role was that of Mr. Edilio Benjamin, which was a drug courier or the captain, and he bolsters. His testimony comes before and prior to that of Danny Montana, and he bolsters the testimony of Danny Montana. The first witnesses presented by the government in the case could not, even if they could suggest that there was an inference that these people were doing something or had some relationship to the drug, there was not a direct link that could be testified by the first witnesses from the prosecution up until Garcia's testimony and his testimony. That's what I would like to clear and that's why we believe that there was, it's not a harmless error, Your Honor. Thank you very much. That concludes the argument in this case. Attorney Tirado Valles, Attorney Rickerhoff, and Attorney MacIgnatis, you should disconnect from the hearing at this time.